# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**ISAAC TURNER**
**Plaintiff,**

**v.** **Case No. 25-C-1949**

**FRANK BISIGNANO,**
**Commissioner of the Social Security Administration**
**Defendant.**

---

## DECISION AND ORDER

Plaintiff Isaac Turner seeks judicial review of the denial of his application for social security disability benefits. He argues the Administrative Law Judge (ALJ) assigned the case improperly discounted the opinions of two agency psychologists and erroneously evaluated the severity and limiting effects of his symptoms. For the reasons set forth below, I agree. I first set forth the applicable legal standards, then review the record, and, finally, address plaintiff's arguments.

## I. STANDARDS OF REVIEW

### A. Disability Determination

The regulations set forth a five-step process for determining disability. 20 C.F.R. § 404.1520(a)(4); 20 C.F.R. § 416.920(a)(4). At step one, the ALJ determines whether the claimant has engaged in gainful employment since his alleged onset of disability. If not, at step two, the ALJ considers whether the claimant suffers from a "severe" impairment or combination of impairments. At step three, the ALJ decides whether any of the claimant's impairments meet or equal the severity of one of the conditions listed in the agency's Listing of Impairments. If

the criteria for a Listing are met, the claimant is per se disabled. If not, the decision process moves on and the ALJ considers the claimant's residual functional capacity (RFC)—that is, his ability to work despite his impairments. At step four, the ALJ determines whether the claimant can perform his past relevant work in light of his RFC. Finally, if not, at step five the ALJ decides whether the claimant can, given his age, education, work experience and RFC, do some other work that exists in significant numbers in the national economy. See Zellweger v. Saul, 984 F.3d 1251, 1253 (7th Cir. 2021).

**B. Judicial Review**

The court will reverse an ALJ's decision denying benefits only if it is not supported by "substantial evidence" or if it is the result of an error of law. Liapis v. Bisignano, 180 F.4th 946, 950 (7th Cir. 2026). The threshold for "substantial evidence" is low, requiring only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Lincoln v. Bisignano, 173 F.4th 886, 891 (7th Cir. 2026). Under this deferential standard, the court will not re-weigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute its judgment for the ALJ's determination so long as substantial evidence supports it. Id. Nevertheless, the court conducts a critical review of the record because an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. Id. Further, legal issues are reviewed de novo, Bertaud v. O'Malley, 88 F.4th 1242, 1244 (7th Cir. 2023), and if the ALJ commits an error of law the court may reverse without regard to the volume of evidence in support of the factual findings, White v. Apfel, 167 F.3d 369, 373 (7th Cir. 1999). Finally, the Commissioner may not in court defend the denial on a rationale not used by the ALJ in his decision. See Poole v. Kijakazi, 28 F.4th 792, 796 (7th Cir. 2022) (citing SEC v. Chenery Corp., 318 U.S. 80, 87 (1943)).

## II. FACTS AND BACKGROUND

### A. Medical Evidence

In his applications, plaintiff alleged that he became disabled as of October 1, 2019, (Tr. at 211, 225), based on a variety of physical and mental impairments.[1] (Tr. at 276.) Earnings records note employment up to 2019. (Tr. at 247, 282.) Plaintiff was incarcerated from 2020 to 2024 (Tr. at 370), and the medical evidence from that period comes from the Department of Corrections. During this time, plaintiff was regularly seen for issues with his foot, knees, and hearing (e.g., Tr. at 475, 479, 487, 499, 515, 522), as well as asthma (Tr. at 410, 493). During initial screening reviews, plaintiff endorsed symptoms of depression, anxiety and claustrophobia, but providers noted no specific mental health diagnoses. (Tr. at 610, 473, 469, 650, 628-29, 627.) Notes from December 2020 to January 2022 documented symptoms such as racing thoughts and easy aggravation with others, but no mental health diagnoses. (Tr. at 625-26, 624, 622-23, 621-22.)

In February 2022, plaintiff reported a panic attack, trouble sleeping, and depression two out of seven days. (Tr. at 619.) He attributed his trouble sleeping to noise and flashbacks. The provider noted a diagnosis of other specific trauma and stressor related disorder, and made a referral to psychiatry. (Tr. at 620.)

A March 2022 psychiatric progress note indicated plaintiff had not been seen previously, referred regarding issues with sleep and anxiety. Plaintiff reported that loud banging noises reminded him of gunshots, but the provider did not see symptoms consistent with specified

---

[1]Plaintiff applied for both disability insurance benefits and supplemental security income. Because the standards for establishing disability are the same under both programs, I address the applications together. Further, because plaintiff relies primarily on mental impairments in seeking benefits, I focus on those impairments in this summary of the record.

trauma or stressor related disorder, instead concluding his complaints sounded like agitation and irritability due to not getting good sleep at night. The provider noted possible issues with plaintiff's CPAP machine. (Tr. at 557.) Mental status exam noted no acute distress, euthymic mood, affect appropriate to mood, intact memory, no gross disorder of thought content or process, normal speech, present eye contact, no hallucinations, and fair insight and judgment. (Tr. at 558.) The provider started plaintiff on Trazodone at bedtime as needed for insomnia. The provider concluded the symptoms were not consistent with PTSD, noting diagnoses of insomnia disorder, unspecified anxiety disorder, and asthma. (Tr. at 559.)

In June 2022, plaintiff reported doing "so-so," his sleep better since starting Trazodone. (Tr. at 617.) On mental status exam, he was alert and oriented, with excellent eye contact, mood and affect congruent and appropriate, thoughts organized and coherent, no evidence of thought disturbance, and normal speech. This note listed a diagnosis of other specified trauma and stressor related disorder. (Tr. at 618.)

In September 2022, plaintiff reported doing well with no complaints. He remained concerned about sleep, and they discussed discontinuing Trazodone and adding Benadryl. (Tr. at 555-56.) In December 2022, plaintiff's primary complaint was of insomnia; he denied depression or anxiety. (Tr. at 554.) The provider's impression was that he was currently stable and did not want medication changes, continuing Benadryl. (Tr. at 555.)

In January 2023, plaintiff reported good sleep with Benadryl. Mental status exam was unremarkable, with no evidence of trauma symptoms. (Tr. at 616.) A March 2023 evaluation noted that, other than discussion related to his offender treatment evaluation, plaintiff had no mental concerns, reporting sleep and appetite were good. (Tr. at 614.) Later that month, plaintiff reported feeling tired during the day, his CPAP not working properly. He denied

depressive or anxiety symptoms. (Tr. at 553.) The provider continued Benadryl at his request. (Tr. at 554.)

In June 2023, plaintiff reported Benadryl helped him sleep. He did endorse flashbacks and hyper-vigilance throughout the day related to past trauma. He worked in servery, noting that when trays were dropped it reminded him of gun shots. He also endorsed increased depression and anxiety, but denied hallucinations. On mental status exam, the provider noted good hygiene, adequate eye contact, cooperative behavior, normal speech, depressed and anxious mood, appropriate affect, logical thought process, grossly intact memory, good attention and recall, and intact insight/judgment. The provider started him on Sertraline for anxiety/depression/PTSD symptoms. (Tr. at 552.)

In September 2023, plaintiff reported improved mood since the last visit, no longer feeling depressed with the Sertraline. Overall, he was happy with where things were and looking forward to his upcoming release. (Tr. at 550.) The provider noted he was responding well to the treatment plan, mood improved with the addition of Sertraline and continuing to sleep well with diphenhydramine (Benadryl). The provider listed a diagnosis of other specified trauma or stressor related disorder. (Tr. at 551.)

In December 2023, plaintiff reported feeling depressed and sad, tense and nervous, hearing voices every now and then. (Tr. at 595.) The provider noted he was alert and oriented, with anxious mood, appropriate eye contact, clear speech, and no overt indication of response to internal stimuli. (Tr. at 596.)

On January 25, 2024, shortly after his release from prison, plaintiff sought psychiatric treatment with Angelia Felton-Wilks, APNP, reporting poor sleep, racing thoughts, anxiety, irritability, and both auditory and visual hallucinations. Felton-Wilks diagnosed major depressive

disorder (MDD), posttraumatic stress disorder (PTSD), generalized anxiety disorder (GAD), adjustment insomnia, panic disorder, bipolar I disorder, and schizo-affective disorder. (Tr. at 724.) She continued him on Sertraline, at increased dosage, and Hydroxyzine for anxiety, and added Abilify as a mood stabilizer. (Tr. at 725.)

Plaintiff returned on February 8, 2024, feeling his moods could be better with an increase in Abilify. He believed the Sertraline and Hydroxyzine were working well. (Tr. at 727.) Felton-Wilks increased the Abilify and continued other medications. (Tr. at 728.)

On March 7, 2024, plaintiff reported that he was still hearing voices and knocks on his door when no one was there. He wanted another increase in Abilify, to which Felton-Wilks agreed. (Tr. at 729-30.)

On April 5, 2024, plaintiff reported, "I'm doing very well." (Tr. at 731.) He noted no hallucinations and stated his mood had improved. Felton-Wilks continued medications. (Tr. at 732.)

On May 10, 2024, plaintiff again reported the medications were working well, but he was having issues getting back on his feet after his release from prison. (Tr. at 733-34.) On that date, Felton-Wilks prepared a mental impairment medical source statement, listing diagnoses of panic disorder, PTSD, MDD, GAD, bipolar disorder, schizo-affective disorder, and adjustment insomnia. (Tr. at 719.) She opined that plaintiff experienced episodic severe fatigue and would need to lie down three or more hours during a typical eight-hour daytime period; would likely have difficulties working with others due to verbal outbursts of anger and withdrawal from work tasks, several times a week or more often; would miss more than four days per month; would have difficulty leaving his residence more than four days per month; would need unscheduled breaks two to three times a day; and would be off task more than

30% of the day. (Tr. at 719-21.) Felton-Wilks further opined that plaintiff had marked limitations in each of the "paragraph B" criteria of the Listings: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. (Tr. at 722-23.)

On May 20, 2024, plaintiff commenced therapy at the Guest House of Milwaukee, the homeless shelter where he was then living. (Tr. at 735.) He presented as open and engaged, reporting struggles to manage his emotional responses. He also reported depressive symptoms, feeling tense and overwhelmed. (Tr. at 744.) On May 28, plaintiff reported better mood. He was alert and oriented, demonstrating continued commitment related to insight and emotional awareness. (Tr. at 743.) On June 3, he missed his appointment. (Tr. at 742.) On June 10, plaintiff presented with polite relaxed affect and noted feeling more hopeful. He reported decreased depression symptoms. He was alert and oriented, but demonstrated minimal improvement related to symptoms and emotional regulation. (Tr. at 741.) Plaintiff missed his appointments on June 24 (Tr. at 740) and July 1 (Tr. at 1176).

On July 9, 2024, plaintiff returned to Felton-Wilks for follow-up, stating the medication was working well for him. He was still looking for housing. On exam, he was appropriately dressed, cooperative, with normal speech, euthymic mood, goal directed thought process, no abnormal thought content, and intact insight/judgment, memory and attention/concentration. (Tr. at 1030.) Felton-Wilks continued medications. (Tr. at 1031.)

On August 9, 2024, plaintiff stated the medications were working well. Exam again revealed normal speech, euthymic mood, goal directed thought process, no abnormal thought content, and intact insight/judgment, memory and attention/concentration. (Tr. at 1033.) Felton-Willks continued medications and made a referral to psychotherapy. (Tr. at 1034.)

Plaintiff missed his appointment with Felton-Wilks on September 4, 2024. (Tr. at 1036.) On September 13, he again reported medications were working well and he was doing okay. Exam revealed the same findings as the previous visit. (Tr. at 1037.) Felton-Wilks continued medications. (Tr. at 1038.)

Plaintiff returned to therapy at the Guest House on September 26, 2024, presenting with polite and engaged affect, but feeling irritable due to his current status. He also reported frustration with other shelter residents and stress with his probation. He was alert and oriented, and demonstrated minimal deterioration related to emotional regulation. (Tr. at 1175.) On October 4, plaintiff presented with open and engaged affect, but reported feeling irritable due to sleep disturbances. He was alert and oriented, and demonstrated moderate improvement related to emotional regulation as he was calmer and more relaxed that day. (Tr. at 1174.) Plaintiff missed his therapy session on October 4 due to needing to see his probation officer. (Tr. at 1173.) On October 9, he again presented with open and engaged affect but felt frustrated with his group work. He was alert and oriented, and demonstrated minimal improvement related to insight and emotional awareness. (Tr. at 1172.)

Plaintiff missed his appointment with Felton-Wilks on October 16, 2024. (Tr. at 1040.) He did attend a therapy session that day, demonstrating continued commitment related to emotional regulation. (Tr. at 1171.) During his October 24 therapy session, plaintiff reported feeling calm. He was alert and oriented, and again demonstrated continued commitment related to emotional regulation and coping skills. (Tr. at 1170.) On October 29, he reported feeling calm but frustrated about his homelessness. He was alert and oriented, and demonstrated continued commitment related to emotional regulation and skill use. (Tr. at 1169.) On November 11, plaintiff reported feeling content, noting successful implementation

of strategies for managing depression and anxiety. He was alert and oriented, and demonstrated continued commitment related to general functioning and skills. (Tr. at 1168.) On November 18, plaintiff presented with withdrawn affect initially but opened up more as the session progressed. He was alert and oriented, and demonstrated continued commitment related to general functioning and skills. (Tr. at 1167.) He missed his therapy session on December 2. (Tr. at 1166.)

On December 4, 2024, plaintiff asked Felton-Wilks about another medication, Vraylar, which had been ordered by his primary care provider; he indicated he had stopped taking Abilify. (Tr. at 1041.) On exam, he was appropriately dressed, cooperative, with normal speech, euthymic mood, goal directed thought process, no abnormal thought content, intact insight/judgment, memory and attention/concentration, and average fund of knowledge. (Tr. at 1041-42.) On January 3, 2025, plaintiff reported Vraylar's effectiveness and wanted to continue, with Felton-Wilks as the prescriber. Exam findings were the same. (Tr. at 1044.)

On January 28, 2025, plaintiff returned to therapy, reporting concerns with the demands of probation and his mother's health. He was alert and oriented, with normal mood. (Tr. at 1165.) On February 3, plaintiff presented with congenial and open affect, and reported feeling hopeful. He was alert and oriented, with normal mood and affect. The therapist indicated he demonstrated minimal improvement related to general functioning and skills. (Tr. at 1164.)

On February 7, 2025, plaintiff returned to Felton-Wilks, reporting the medication seemed to be working well; he noted overall stability and denied side effects. Exam findings were again the same. (Tr. at 1047.) Felton-Wilks continued medications. (Tr. at 1048.)

During a February 17, 2025, therapy session, plaintiff reported anxiety and frustration about his situation, as well as agitation. His speech was normal, mood and affect appropriate,

and thoughts normal, with no signs of delusions and normal judgment. (Tr. at 1163.) On March 3, plaintiff reported feeling anxious due to the situation with his mother. He was alert and oriented, with normal affect and normal mood. He demonstrated continued commitment related to emotion and stress regulation and use of coping skills. (Tr. at 1162.) He canceled on March 17. (Tr. at 1161.) On April 14, plaintiff again reported feeling frustrated about his living situation and probation requirements. He was alert and oriented, with normal mood and affect. He demonstrated moderate improvement related to emotional regulation as he was calmer and more relaxed that day. (Tr. at 1160.) On April 25, plaintiff reported feeling hopeful. He was alert and oriented, and demonstrated moderate improvement related to emotional regulation as he was again calmer and more relaxed. (Tr. at 1159.) On May 21, however, plaintiff reported feeling frustrated and overwhelmed due to new demands from his shelter case manager, with cravings to drink and use marijuana. He was alert and oriented, and demonstrated minimal deterioration related to recovery and mental health symptoms. (Tr. at 1158.)

## B. Procedural History

### 1. Plaintiff's Application and Agency Decisions

Plaintiff applied for benefits in November 2023, alleging a disability onset date of October 1, 2019. (Tr. at 211, 225.) He listed impairments of sleep apnea, bipolar disorder, anxiety, depression, short term memory loss, asthma, and high blood pressure. (Tr. at 276.) In a function report, plaintiff stated it was hard for him to deal with groups of people or close environments. (Tr. at 290.) He reported spending time with his mother, helping her clean her apartment, and watching TV. He further reported short term memory problems, anxiety attacks, and hearing voices (Tr. at 291), as well as hearing loss and knee pain (Tr. at 295). He was able

to prepare meals, perform household chores, and tend to his personal care. (Tr. at 291-92.) He shopped once per months in stores, used public transportation, and could handle money. (Tr. at 293.) He followed instructions OK and got along good with authority figures (Tr. at 295), but handled stress poorly and sometimes heard voices (Tr. at 296).

The agency sent plaintiff for a mental status evaluation with Edward Dow, Ph.D., on August 14, 2024. Plaintiff reported marginal reading ability and needed help understanding correspondence. He also reported difficulty remembering instructions and staying focused. (Tr. at 966.) He stated that he started hearing voices about five years ago. (Tr. at 967.) He did not report symptoms consistent with depression or panic disorder, but did report symptoms consistent with anxiety and thought disorder. (Tr. at 967-68.)

On exam, plaintiff exhibited no unusual motor behavior; he also demonstrated good eye contact while speaking and fair eye contact when spoken to. (Tr. at 968.) He exhibited fluent speech; thoughts were coherent and goal directed with no evidence of hallucinations in the evaluation setting. (Tr. at 969.) He displayed a flat mood and stated he felt anxious. He was oriented times three. His attention and concentration were grossly intact, but he had trouble staying focused with serial challenges and his mental math skills were not good. He was unable to spell the word “world” forward or backward, his memory recall was not good, he lacked details when recalling past events, and his working memory was easily derailed. His cognitive functioning appeared below average. (Tr. at 969.) Dr. Dow noted that plaintiff’s responses were impoverished and unelaborated, he was unable to state the meaning of simple proverbs, his insight appeared to be concrete, and his judgment appeared to be limited. Dr. Dow summarized that plaintiff demonstrated a rather poor memory and was likely functionally illiterate. “His ability to exercise reasonable judgment is iffy and he trends to the concrete in his

thinking." (Tr. at 970.)

Regarding plaintiff's work capacity, Dr. Dow found marked limitations in the ability to understand, remember or apply complex directions and instructions, sustain concentration and perform a task at a consistent pace, and regulate emotions, control behavior and maintain well-being; moderate limitations in the ability to understand, remember or apply simple directions and instructions, use reason and judgment to make work-related decisions, interact adequately with supervisors, co-workers and the public, and sustain an ordinary routine and regular attendance at work; and mild limitations in the ability to maintain personal hygiene and appropriate attire, and be aware of normal hazards and take appropriate precautions. (Tr. at 971.) Dr. Dow listed diagnoses of schizo-affective disorder and unspecified anxiety disorder, with a poor prognosis. "His mental health issues have endured for many years with no appreciable gains in his ability to function." (Tr. at 971.) Dr. Dow concluded: "The claimant will not be able to manage his own funds due to his limited ability to read or do simple mental math. The claimant may benefit from having a payee." (Tr. at 971.)

The agency also sent plaintiff for a consultative medical exam with Ragav Sharma, D.O., on September 7, 2024. (Tr. at 976.) On exam, Dr. Sharma noted normal speech, memory, concentration, affect, and behavior. (Tr. at 977.) Dr. Sharma performed various tests of plaintiff's physical condition (Tr. at 978-81), also noting memory loss (unable to recall 3 words after 5 minutes) (Tr. at 982). After assessing plaintiff's physical capacity, Dr. Sharma wrote: "Has significant psychological/psychiatric issues that are best evaluated by a psychologist/psychiatrist if not already done." (Tr. at 982.)

The agency denied the application initially (Tr. at 77, 111) based on the review of Samantha Lavarda, Psy.D., who found plaintiff's mental impairments non-severe (Tr. at 65-66),

and Pat Chan, M.D., who found that plaintiff had no exertional limitations but should avoid work in a loud environment due to hearing loss and exposure to triggers (e.g., fumes, extreme heat/humidity) due to asthma (Tr. at 66-67). Plaintiff requested reconsideration (Tr. at 117, 134), but the agency maintained the denial (Tr. at 109, 122) based on the reviews of Mina Khorshidi, M.D., who found plaintiff capable of light work with additional communicative and environmental limitations (Tr. at 88-89), and Robert Barthell, Psy.D., who disagreed with the previous assessment, finding a severe mental impairment with moderate limitations in the four broad areas of mental functioning (Tr. at 84-85). Dr. Barthell concluded that plaintiff could understand and remember short simple instructions of two to three steps; could maintain sufficient attention, persistence, and pace to carry out a learned routine in a predictable work setting without fast-faced production demands; could maintain at least occasional contact with the general public and co-workers, and accept supervision and feedback to establish simple work routines; and could perform work that does not require changing tasks on a daily basis but rather has a fairly regular set of job duties and expectations. (Tr. at 91-92.)

Plaintiff then requested a hearing before an ALJ. (Tr. at 139.) Prior to the hearing, he amended the alleged onset date to January 6, 2024, the date of his release from prison.[2] (Tr. at 369.)

**2. Hearing**

On August 12, 2025, plaintiff appeared with counsel for his hearing before the ALJ. The ALJ also called a vocational expert (VE) to offer testimony on jobs plaintiff might be able to do.

[2] Counsel's pre-hearing brief amended the onset date to January 16, 2024 (Tr. at 369), but the hearing transcript and the ALJ's decision note a date of January 6, 2024 (Tr. at 15, 38). The discrepancy appears to have no impact on the case.

(Tr. at 34.)

Plaintiff testified that he could not work due to difficulty remembering things, outbursts, anxiety, and depression. He specifically noted outbursts when people approached him. (Tr. at 40.) He also experienced panic attacks, where he needed to isolate himself. (Tr. at 43-44.) The attacks were triggered by closed environments and loud people. (Tr. at 44.) He further reported trouble sleeping at night due to flashbacks, taking naps during the day. (Tr. at 46.) He found it hard to focus and remember things. (Tr. at 47.) He treated with medications, which helped, and therapy, which he also found helpful. (Tr. at 41-42, 46.)

Plaintiff testified that he spent time with his mother, helped her make meals or do chores around the apartment, and enjoyed outdoor activities like operating remote controlled cars and flying kites. (Tr. at 42.) He shopped once per month. (Tr. at 43.)

The ALJ then turned to the VE, asking a hypothetical question assuming a person of plaintiff's age, education and work experience, limited to light work with no climbing of ladders, ropes and scaffolds, and occasional climbing of ramps and stairs; needed to avoid concentrated exposure to irritants; could maintain attention, concentration, persistence, and pace for simple job tasks with regularly scheduled breaks; with no more than occasional decision-making and changes in the work setting; and no more than occasional interaction with the public, coworkers, and supervisors. (Tr. at 49.) The VE testified that such a person could work as a merchandise marker, collator operator, or small product assembler. (Tr. at 50.) Adding a limitation of no public contact, the product assembler job would remain but the number of marker and operator jobs would be reduced. (Tr. at 50-51.)

Plaintiff's counsel asked the VE to add to the first hypothetical restrictions consistent with Dr. Barthell's opinion, i.e., understand and remember short simple instructions of two to

three steps, and maintain sufficient attention, persistence and pace to carry out a learned routine in a predictable work setting without fast-faced production demands. (Tr. at 52.) The VE responded that the production pace limitation would eliminate the assembler job. (Tr. at 52.) He hesitated to opine on the impact of a two to three step limitation. (Tr. at 53.) "I'm kind of punting in the issue of steps. I think you're in a gray area as to what, I mean these are not complicated jobs. These are unskilled jobs, but I think the two to three – usually I think of it as three to four steps." (Tr. at 53.) He offered an "educated guess" that half of the unskilled jobs would remain. (Tr. at 53.) The VE testified that the "predictable work setting" limitation would not affect the identified jobs. (Tr. at 53.) Counsel also asked the VE about the tolerance for "verbal outbursts" in the workplace (Tr. at 53), and he responded that in a public position there would be no tolerance (Tr. at 54). If significant and frequent, they would not be tolerated in non-public jobs. (Tr. at 55.) Finally, the VE testified that employers tolerate 15% time off task and 12 absences per year. (Tr. at 55-56.)

**3. ALJ's Decision**

On August 28, 2025, the ALJ issued an unfavorable decision. (Tr. at 10.) At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since his alleged onset date of January 6, 2024. (Tr. at 15.) At step two, the ALJ found that plaintiff had the severe impairments of schizo-affective disorder, bipolar disorder, major depressive disorder, panic disorder, anxiety, PTSD, and bilateral knee arthritis. (Tr. at 15.) At step three, the ALJ concluded that none of these impairments met or equaled a Listing. (Tr. at 17-18.) The ALJ specifically considered plaintiff's mental impairments under Listings 12.03, 12.04, 12.06, and 12.15, which are satisfied if the claimant has at least two "marked" limitations or one "extreme" limitation under the "paragraph B" criteria: (1) understanding, remembering, or applying

information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself. (Tr. at at 17.) The ALJ found "mild" limitation in the first area and "moderate" limitations in the remaining three areas. (Tr. at 17-18.)

Prior to step four, the ALJ determined that plaintiff had the RFC to perform light work, except that he could maintain attention, concentration, persistence, and pace for simple tasks with regularly scheduled breaks; could have occasional interaction with the public, coworkers, and supervisors; could perform jobs having only occasional decision-making and changes in work setting; needed to avoid concentrated exposure to irritants such as fumes, odors, and gases; could not climb ladders, ropes, and scaffolds; and could do occasional climbing of ramps and stairs. In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 18.)

The ALJ found plaintiff's statements regarding the intensity, persistence, and limiting effects of his symptoms partially consistent with the medical evidence and other evidence in the record. (Tr. at 19, 22.) He explained:

> The claimant reports mental symptoms such as memory problems, verbal outbursts, difficulty focusing, hallucinations, difficulty sleeping, and being overwhelmed due to life stressors (Exhibits 12F, 16F, 19F; Hearing Record). While he has mental symptoms, his behavioral health treatment records show relatively normal mental examinations (Exhibits 16F, 19F). He does exhibit difficulties with memory at consultative examinations, but his treatment records state he has intact recent and remote memory and normal awareness of current and past events (Exhibits 16F, 19F). . . . Although he reports various ongoing problems, he confirms he can help his mother clean her apartment, manage personal care tasks, make meals, do household chores, use remote control cars, fly kites, use public transit, shop in stores, handle money, and drive (Exhibit 4E and Hearing Record).

(Tr. at 22.)

As for the medical opinions, the ALJ first considered the report from plaintiff's treating

psychiatric nurse practitioner, Angelia Felton-Wilks, which endorsed significant work limitations, e.g., more than four absences per month, inability to consistently and independently leave his residence, need for unscheduled work breaks, and more than 30% time off task. (Tr. at 22-23.) The ALJ found Nurse Felton-Wilks's opinion unpersuasive because it was not supported by her treatment records, which contained normal mental status findings and noted that plaintiff's psychiatric medications worked well for him. The ALJ also found the opinion inconsistent with other evidence, including therapy records documenting normal mental status findings. Finally, the ALJ noted that while plaintiff exhibited abnormalities during the psychological consultative examination, his presentation was not consistent with the level of restriction set forth in Nurse Felton-Wilks's opinion. (Tr. at 23.)

The ALJ next considered the report from the psychological consultative examiner, Dr. Dow, who found marked limitations in understanding, remembering, or applying complex directions and instructions; sustaining concentration and performing a task at a consistent pace; and regulating emotions, controlling behavior, and maintaining well-being. Dr. Dow further found plaintiff moderately limited in the areas of understanding, remembering, or applying simple directions and instructions; using reason and judgment to make work-related decisions; interacting adequately with supervisors, coworkers, and the public; and sustaining an ordinary routine and regular attendance at work. (Tr. at 23.) Regarding this opinion, the ALJ concluded:

> Dr. Dow's opinions about marked limitations and a moderately limited ability to understand, remember or apply simple directions and instructions are unpersuasive. The psychological consultative examination does not support Dr. Dow's opinions about these areas. Rather, the consultative examination and other evidence herein appear to be more in accordance with mild and moderate limitations. Other parts of Dr. Dow's opinion about moderate limitations are largely persuasive. In this case, the psychological consultative examination does

> show abnormalities such as a flat mood, guarded behavior, concrete insight, limited judgment, and memory difficulties; however, the claimant has grossly intact attention and concentration, satisfactory grooming, coherent and goal-directed thoughts, and the ability to engage in a range of activities such as using public transportation, doing laundry and cleaning tasks, and managing his finances (Exhibit 12F). Likewise, his medical consultative examination shows largely normal concentration, intact attention, a well-dressed appearance, normal affect, normal speech, and normal behavior (Exhibit 14F). While he exhibits difficulties with memory at these consultative examinations, his treatment records show intact recent and remote memory and normal awareness of current and past events (Exhibits 16F, 19F). Further, the psychiatric records and therapy records show the claimant has mental symptoms and ongoing life stressors but largely normal examinations and a treatment regimen that works well (Exhibits 16F, 19F).

(Tr. at 23-24.)

The ALJ then turned to the reports of the agency reviewing psychologists. The initial level reviewer, Dr. Lavarda, found that plaintiff had no severe mental impairments. The ALJ found this opinion unpersuasive because it was not consistent with the treatment records or psychological consultative examination. (Tr. at 24.) The reconsideration level reviewer, Dr. Barthell, found that plaintiff had a moderate limitation overall in understanding, remembering, and carrying out tasks, with marked difficulty understanding and remembering detailed instructions. The ALJ deemed this finding unpersuasive, stating:

> Although the claimant exhibits memory difficulties at the consultative examinations, his psychiatric records repeatedly show intact recent and remote memory and therapy records show normal awareness of current and past events (Exhibits 12F, 14F, 16F, 19F). While the claimant's psychological consultative examination states he has estimated below average cognitive functioning, other examinations show average fund of knowledge, logical and relevant thoughts, and intact calculation abilities (Exhibits 12F, 14F, 16F, 19F).

(Tr. at 24.) Dr. Barthell found moderate limitations in the areas of concentration, persistence, and pace, social interaction, and adaptation, opining that plaintiff could nevertheless carry out a learned routine without fast-paced production demands, maintain occasional contact with the

public and coworkers, and perform work with a regular set of duties and expectations. (Tr. at 24.) The ALJ stated that:

> These portions of Dr. Barthell's findings are largely persuasive because they are supported by his explanation and consistent with other evidence (Exhibits 5A, 16F, 19F). It is notable that the assigned residual functional capacity uses slightly different terms that are vocationally relevant and fully account for the claimant's moderate mental limitations. Dr. Barthell explains that the claimant reports mental health symptoms, but his mental status examinations have been unremarkable other than some mild anxiety symptoms (Exhibit 5A/8). Dr. Barthell also explains the claimant does exhibit some difficulty with delayed recall at the consultative examinations and he endorses hallucinations, but he does describe fairly independent function including the ability to manage medical appointments, taking public transport, and manage finances (Exhibit 5A/8). Similar to Dr. Barthell's explanation, the claimant's behavioral health records do reveal relatively normal mental examinations (Exhibits 16F, 19F). Progress notes also document the claimant's reports that his medication regimen works well and he is stable overall (Exhibit 16F). Moreover, the claimant's psychological consultative examination shows mixed results but grossly intact concentration and goal-directed thoughts with no evidence of hallucinations (Exhibit 12F). Further, the claimant's reports indicate he can engage in a fair range of activities such as helping his mother clean her apartment, managing personal care tasks, making meals, using remote control cars, flying kites, and shopping in stores (Exhibit 4E and Hearing Record).

(Tr. at 24-25.)

At step four, the ALJ found that plaintiff had no past relevant work. (Tr. at 26.) Finally, at step five, the ALJ found that plaintiff could perform other jobs, as identified by the VE, including merchandise marker, collator operator, and small products assembler. (Tr. at 27.) The ALJ accordingly found plaintiff not disabled. (Tr. at 27-28.)

On October 6, 2025, the Appeals Council denied plaintiff's request for review. (Tr. at 1.) This action followed.

## III. DISCUSSION

### A. Medical Opinions

Plaintiff argues the ALJ erred in evaluating the opinions from Drs. Barthell and Dow. (Pl.'s Br. at 4.) The ALJ must articulate how "persuasive" he finds all of the medical opinions and prior administrative medical findings in the case record. 20 C.F.R. § 404.1520c(b). The factors of "supportability" and "consistency" are the most important in determining how persuasive an opinion is; therefore, the ALJ must explain how he considered these two factors. Id. § 404.1520c(b)(2); see also Liapis, 180 F.4th at 952 (noting that failure to do so is "clear legal error"). Under the supportability factor, the "more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1). Under the consistency factor, the "more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. § 404.1520c(c)(2). The ALJ may, but is not required to, explain how he considered the other factors: the source's relationship with the claimant, the source's specialization, and the source's familiarity with the other evidence in the record or an understanding of the disability program's policies and evidentiary requirements. Id. §§ 404.1520c(b)(2), (c)(3)-(5).

Plaintiff first argues the ALJ erred in rejecting Dr. Barthell's marked limitation in understanding and remembering detailed instructions. (Pl.'s Br. at 4.) The ALJ noted that, while the consultative examinations suggested deficiencies in memory and cognitive functioning,

treatment notes showed intact memory, average fund of knowledge, and logical and relevant thoughts. (Tr. at 24.)

Plaintiff notes that agency psychological consultants like Dr. Barthell are "highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 1513a(b)(1). Plaintiff further notes that such experts are tasked with reviewing the entire medical record, and Dr. Barthell did so here, including the treatment notes and consultative examiners' findings. (Pl.'s Br. at 5; Tr. at 85-86.) Plaintiff complains that the ALJ reviewed this same evidence and concluded, based on noting more than his lay speculation or intuition, that plaintiff was only moderately limited. (Pl.'s Br. at 6.) Plaintiff relies on Seventh Circuit cases holding an ALJ may not stray beyond his expertise as an adjudicator and into the forbidden territory of "playing doctor." Mandrell v. Kijakazi, 25 F.4th 514, 518 (7th Cir. 2022); see also Goins v. Colvin, 764 F.3d 677, 680 (7th Cir. 2014) (collecting cases holding the ALJ may not "play doctor"); Moon v. Colvin, 763 F.3d 718, 722 (7th Cir. 2014) ("ALJs are required to rely on expert opinions instead of determining the significance of particular medical findings themselves."). Plaintiff indicates that the ALJ cited no evidence Dr. Barthell did not review, nor did he rely on a contrary medical opinion to discount Dr. Barthell's marked finding. (Pl.'s Br. at 6.) Finally, plaintiff contends the error cannot be deemed harmless, for if the ALJ had included this marked limitation in the RFC, he likely could not perform the jobs identified by the VE, all "Reasoning Level 2" positions involving "detailed but uninvolved written and oral instructions. (Pl.'s Br. at 7, citing the Dictionary of Occupational Titles.) Plaintiff concludes that he does not ask the court to re-weigh the evidence but rather remand for proper evaluation of Dr. Barthell's opinion. (Pl.'s Br. at 8.)

Plaintiff argues the ALJ also erred in evaluating the opinion from Dr. Dow, the consultative examiner. (Pl.'s Br. at 8.) As indicated above, Dr. Dow found marked limitations

in the ability to understand, remember, or apply complex directions and instructions; sustain concentration and perform a task at a consistent pace; and regulate emotions, control behavior, and maintain well-being. He also found a moderate limitation in the ability to understand, remember, or apply simple directions and instructions. (Tr. at 971.) The ALJ deemed these opinions unpersuasive, finding them unsupported by Dr. Dow's own examination findings and inconsistent with plaintiff's activities and the treatment records reflecting largely normal examinations and a treatment regimen that works well. (Tr. at 23-24.)

Plaintiff notes that Dr. Dow supported his opinion with numerous objective mental status findings, concluding that plaintiff demonstrated poor memory, was functionally illiterate, and had difficulty exercising reasonable judgment. (Pl.'s Br. at 9-10.) Plaintiff complains that the ALJ simply disagreed with Dr. Dow as to the significance of these abnormal findings, citing no medical authority in support of his conclusion that the findings supported only mild to moderate functional restrictions. Relying on the same "playing doctor" line of authority, plaintiff concludes that an ALJ may not rely on his own lay intuition to discount the opinion of a qualified medical professional. (Pl.'s Br. at 10.)

Plaintiff further argues that the ALJ failed to explain how he considered evidence that was reasonably consistent with Dr. Dow's opinion, most significantly Dr. Barthell's finding of marked limitation in understanding and remembering detailed instructions. (Pl.'s Br. at 11.) The ALJ cited treatment notes containing findings the ALJ believed contradicted Dr. Dow's opinion, but he failed to consider the many contrary indications in those records, e.g., agitation, racing thoughts, and difficulties with memory, comprehension and articulation. (Pl.'s Br. at 11-12.) Similarly, while the ALJ cited various daily activities in support of his conclusion, he failed to grapple with plaintiff's reported struggles in daily life including homelessness and frustration

with others in the shelter. (Pl.'s Br. at 13.) While ALJs need not discuss every piece of evidence, they "are not permitted to cherry-pick evidence from the record to support their conclusions, without engaging with the evidence that weighs against their findings." Plessinger v. Berryhill, 900 F.3d 909, 915 (7th Cir. 2018); see also Bjornson v. Astrue, 671 F.3d 640, 647 (7th Cir. 2012) ("The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . ., and is not held to a minimum standard of performance, as she would be by an employer.").

Plaintiff concludes that the ALJ selectively considered the evidence and failed to explain how his ability to perform trivial tasks translated into the ability to work full-time. (Pl.'s Br. at 14.) And the error cannot be deemed harmless, plaintiff contends, for a marked limitation in the ability to understand, remember, or apply complex directions and instructions would likely preclude the Reasoning Level 2 jobs identified by the VE. (Pl.'s Br at 15.)

The Commissioner responds that the ALJ met his duty to minimally explain his assessment of the psychologists' opinions, and the court must decline plaintiff's invitation to re-weigh this evidence. (Def.'s Br. at 3.) The Commissioner notes that the ALJ did not "reject" these opinions; instead, he deemed them partially persuasive, finding the marked limitations unsupported by the consultative examination findings and inconsistent with the exams of plaintiff's treating providers, but accepting their other "moderate" limitations. (Def.'s Br. at 4.)

The Commissioner further notes that the ALJ discussed plaintiff's alleged limitations and the treatment records earlier in his decision (Tr. at 20-23), and the court should read his decision holistically when reviewing his reasoning (Def.'s Br. at 4-5). While plaintiff disagrees with the ALJ's assessment of the evidence, he has not proved that the record compels a

contrary result. See Deborah M. v. Saul, 994 F.3d 785, 788 (7th Cir. 2021) ("[W]e will reverse only if the record compels a contrary result.") (internal quote marks omitted). The ALJ was not, the Commissioner contends, obligated to defer to Drs. Barthell and Dow simply due to their credentials. (Def.'s Br. at 5.) After all, "the determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." Thomas v. Colvin, 745 F.3d 802, 808 (7th Cir. 2014). Here, the ALJ found the marked limitations unsupported by Dr. Dow's exam findings and inconsistent with the normal mental status exams from plaintiff's providers, satisfying the requirements of § 404.1520c(b)(2). While plaintiff cites his own subjective reports of limitations from the treatment notes, the ALJ reasonably relied on the mental status exams. (Def.'s Br. at 6.)

The Commissioner concludes that the ALJ satisfied the lax standards for assessing medical opinions, see Elder v. Astrue, 529 F.3d 408, 415 (7th Cir. 2008) ("If the ALJ discounts the physician's opinion after considering these factors, we must allow that decision to stand so long as the ALJ minimally articulated his reasons--a very deferential standard that we have, in fact, deemed lax.") (cleaned up), and plaintiff fails to prove the ALJ's assessment of the regulatory factors was unreasonable, see Bakke v. Kijakazi, 62 F.4th 1061, 1068 (7th Cir. 2023) ("This explicit weighing is precisely within the purview of the ALJ—and it is not our place to reweigh evidence, even where reasonable minds might disagree about the outcome."). (Def.'s Br. at 6-7.)

Plaintiff replies that the Commissioner largely recounts the ALJ's decision, without specifically responding to his arguments. The Commissioner accuses plaintiff of asking the court to re-weigh the evidence when in fact he seeks remand so the ALJ can properly evaluate the opinions under § 404.1520c, without relying on his own lay intuition, and articulate his

consideration of evidence favorable to the claim. (Pl.'s Rep. Br. at 2.) The Commissioner also stresses the minimal articulation standard but does not acknowledge that if an ALJ commits an error of law, such as by playing doctor, reversal is required regardless of the evidentiary support. (Pl.'s Rep. Br. at 3.) The Commissioner notes that the ALJ did not reject these opinions outright, finding them partially persuasive, but the ALJ did reject the portions concerning the most severe impacts on plaintiff's ability to work. (Pl.'s Rep. Br. at 4.) Had the ALJ included these limitations, plaintiff would be precluded from performing the jobs the ALJ relied upon at step five. (Pl.'s Rep. Br. at 4-5, 8.)

* * *

To be sure, the ALJ gets to determine a claimant's RFC. See Thomas, 745 F.3d at 808. And this is done based on the entire record; the ALJ need not rely entirely on a particular physician's opinion or choose between the various opinions in the record. See Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007). What makes this case difficult is the ALJ's decision to discount every opinion in the record, from treating and consulting sources,[3] in finding no more than moderate mental limitations. As courts in this circuit have noted, remand may be required when the ALJ rejects all of the medical opinions and prior administrative medical findings and instead constructs an RFC based on his own view of the objective medical evidence and hearing testimony. E.g., Kara v. Kijakazi, No. 20-cv-0344, 2022 U.S. Dist. LEXIS 166538, at *6 (E.D. Wis. Sept. 15, 2022); see also Shirley A.J. v. O'Malley, No. 3:23-CV-00113, 2024 U.S. Dist. LEXIS 57673, at *17 (N.D. Ind. Mar. 29, 2024) ("[B]y not adopting any medical

[3]Plaintiff does not challenge the ALJ's evaluation of the opinion from treating Nurse Practitioner Felton-Wilks. As indicated above, she endorsed marked limitations in each of the paragraph B areas, as well as a number of seemingly work-preclusive limitations.

opinion relative to a medical condition, an ALJ can create an evidentiary deficit."). To be clear, I do not adopt a rule "that an ALJ who rejects all the medical opinions of record—as the ALJ did here—is automatically 'playing doctor' in later reaching an RFC determination." Matthew M. v. Kijakazi, No. 4:20-cv-00239, 2021 U.S. Dist. LEXIS 237624, at *22 (S.D. Ind. Dec. 13, 2021). In the present case, however, remand is required.

First, while the ALJ found the marked limitations recommended by Drs. Barthell and Dow inconsistent with treatment notes reflecting what the ALJ deemed to be unremarkable examinations, he failed to consider whether these opinions were consistent with each other. See Gerstner v. Berryhill, 879 F.3d 257, 263 (7th Cir. 2018) (remanding where, inter alia, the ALJ failed to consider whether an opinion was consistent with opinions from other sources). Second, the ALJ found that Dr. Dow's examination did not support marked limitations, but he failed to explain why that was so. The ALJ catalogued the findings from that exam, some normal, some not, but built no bridge from those findings to his conclusion that the exam supported only mild to moderate limitations. See George C. v. Kijakazi, No. 2:22-CV-34, 2023 U.S. Dist. LEXIS 34796, at *6-8 (N.D. Ind. Mar. 2, 2023) (remanding where the ALJ failed to explain why the consultant's examination did not support his opinion). Third, to the extent the ALJ relied on plaintiff's activities to find no more than moderate limitations, he failed to explain how those rather mundane tasks, e.g., helping his mother clean, managing personal care tasks, shopping in stores, making meals, and using public transportation, undermined the opinions of the agency psychologists supporting greater limitations. See Cory W. v. Kijakazi, No. 2:20-cv-00610, 2022 U.S. Dist. LEXIS 48421, at *19 (S.D. Ind. Mar. 18, 2022) (remanding where the ALJ failed to bridge a bridge explaining how minimal activities like shopping, preparing meals, using public transportation, and caring for personal hygiene undermined a

doctor's opinion).

As the Seventh Circuit has noted, "rejecting or discounting the opinion of the agency's own examining physician that the claimant is disabled, as happened here, can be expected to cause a reviewing court to take notice and await a good explanation for this unusual step." Beardsley v. Colvin, 758 F.3d 834, 839 (7th Cir. 2014); see also Garcia v. Colvin, 741 F.3d 758, 761 (7th Cir. 2013) (noting that an agency doctor is unlikely to exaggerate a claimant's limitations, as the claimant is not his patient and favoritism with claimants would not go down well with the agency). The ALJ failed to provide such an explanation here, so the matter must be remanded for reconsideration of the opinions from Drs. Dow and Barthell.[4]

**B. Symptom Evaluation**

Plaintiff next challenges the ALJ's evaluation of his statements regarding his symptoms. (Pl.'s Br. at 16.) The regulations state that, in determining whether a claimant is disabled, the ALJ must consider all symptoms, including pain, and the extent to which those "symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a). SSR 16-3p sets forth a two-step process for symptom evaluation. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p, 2016 SSR LEXIS 4, at *5. Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to function. Id. at *9.

At the second step, the ALJ may not discount a claimant's subjective complaints solely

[4]The Commissioner does not dispute that adoption of the limitations recommended by Drs. Dow and Barthell could eliminate the jobs upon which the ALJ relied.

because his statements are not supported by objective medical evidence. Id. at *10. Rather, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record considering, in addition to the objective medical evidence, the claimant's daily activities; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate the symptoms; treatment, other than medication, the claimant receives or has received for relief of the symptoms; and any measures other than treatment the claimant uses or has used to relieve the symptoms. Id. at *10-11, 18-19.

"The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." Id. at *26. So long as the ALJ gives specific reasons supported by the record, the court will overturn his evaluation of a claimant's subjective symptoms only if it is "patently wrong," which means the decision lacks any explanation or support. Pufahl v. Bisignano, 142 F.4th 446, 458 (7th Cir. 2025).

As indicated above, the ALJ found plaintiff's statements "partially consistent" with the medical evidence and other evidence in the record. (Tr. at 19, 22.) In making this finding, the ALJ stated that, while plaintiff has mental symptoms, the treatment records showed relatively normal mental examinations. Plaintiff also engaged in various activities, including helping his mother clean her apartment, managing personal care tasks, making meals, doing household chores, using remote control cars, flying kites, using public transit, shopping in stores, handling money, and driving. (Tr. at 22.)

Plaintiff argues that the ALJ failed to articulate how the "normal" examination findings

overcame the evidence favorable to his claim, including the findings of the consultative examiners. (Pl.'s Br. at 16.) Nor did the ALJ fully consider the SSR 16-3 factors. While the ALJ noted various daily activities, he did not explain how they contradicted plaintiff's allegations. (Pl.'s Br. at 17.) For instance, while the ALJ noted plaintiff enjoyed flying kites, he did not explain how that activity undermined plaintiff's alleged difficulties focusing, interacting with others, and controlling anger. (Pl.'s Br. at 18.) Nor did the ALJ discuss plaintiff's significant limitations in managing his daily activities; for instance, he shopped just once a month, needed reminders and received assistance from others, and became agitated without any reason. (Pl.'s Br. at 18-19.)

The Commissioner responds that judicial review of an ALJ's symptom evaluation is extremely deferential (Def.'s Br. at 7), and plaintiff fails to prove that the analysis here lacked any explanation or support (Def.'s Br. at 8). While plaintiff argues the ALJ should have given more weight to select abnormal findings, the ALJ reasonably concluded that the predominantly normal mental status findings from plaintiff's own providers undermined the debilitating limitations he alleged. (Def.'s Br. at 8.) Likewise, the ALJ was permitted to consider plaintiff's daily activities, see Alvarado v. Colvin, 836 F.3d 744, 750 (7th Cir. 2016) ("[W]e have cautioned ALJs not to equate such activities with the rigorous demands of the workplace. But it is entirely permissible to examine all of the evidence, including a claimant's daily activities, to assess whether testimony about the effects of his impairments was credible or exaggerated.") (internal citations and quote marks omitted), and the ALJ acknowledged plaintiff's self-reported limitations, see Gedatus v. Saul, 994 F.3d 893, 901 (7th Cir. 2021) (noting that ALJs are permitted to summarize evidence and need not include every detail). (Def.'s Br. at 8.)

Plaintiff replies that the Commissioner does not respond to his argument that the ALJ

failed to consider the enumerated factors in SSR 16-3p. (Pl.'s Rep. Br. at 9-10.) Nor does the Commissioner respond to his contention that the ALJ failed to explain how his activities undermined his claims, instead simply asserting that it is permissible to consider such activities. (Pl.'s Rep. Br. at 10-11.)

* * *

Review of an ALJ's credibility finding may be deferential, but "it is not abject." Parker v. Astrue, 597 F.3d 920, 921 (7th Cir. 2010). The ALJ's reliance on plaintiff's "relatively normal mental examinations" stands in considerable tension with the record review completed by Dr. Barthell and the detailed exam findings from Dr. Dow, see Mandrell, 25 F.4th at 518 (remanding where the ALJ strayed beyond his expertise as an adjudicator in dismissing most of the symptoms that accompanied the claimant's condition), and the ALJ did not explain how the "normal" findings outweighed the abnormal ones. See Reinaas v. Saul, 953 F.3d 461, 467 (7th Cir. 2020) ("[T]he problem is not that the ALJ weighed the evidence in a certain way; it is that she cited only evidence favorable to her decision without discussing any contrary evidence."). The ALJ also listed various activities, but he failed to explain how any of them undermined plaintiff's claims, nor is any such inconsistency obvious. See Cullinan v. Berryhill, 878 F.3d 598, 603 (7th Cir. 2017) ("[T]he ALJ did not explain why doing these household chores was inconsistent with Cullinan's description of her pain and limited mobility. Nor is any inconsistency obvious, so the ALJ did not substantiate the finding that Cullinan's daily activities reveal any exaggeration of Cullinan's limitations."); Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001) (remanding where the ALJ failed to explain the inconsistencies between fairly restricted activities and the claimant's allegations). The matter must be remanded for reconsideration of plaintiff's symptoms.

## IV. CONCLUSION

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and this matter is remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four. The clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 1st day of September, 2026.

/s/ Lynn Adelman
LYNN ADELMAN
District Judge